Ron BAILEY, Appellant,

v.

**INNOVATIVE MANAGEMENT & INVESTMENT, INC.,**
Respondent.

No. WD 50922.

Missouri Court of Appeals,
Western District.

Dec. 19, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30,1996.

Application to Transfer Denied
March 26, 1996.

Debbie S. Champion, St. Louis, for appellant.

Jeffrey O. Parshall, Columbia, for respondent.

Before SMART, P.J., and LOWENSTEIN and BERREY, JJ.

SMART, Presiding Judge.

This case involves an appeal from summary judgment. Ron Bailey filed a products liability claim against Innovative Management & Investment, Inc. ("IMI") to recover damages for injuries sustained when a nail gun was accidentally discharged into his head. The trial court granted summary judgment in favor of IMI. Bailey appeals.

Judgment is affirmed.

On April 17, 1986, Ron Bailey was injured when a man named K.C. Thompson ("K.C.")

accidentally discharged a nail from a nail gun into his head. K.C. was helping build his brother's house. Robert Brent Thompson ("Thompson"), K.C.'s brother, hired K.C. as a subcontractor to do the framing work on the house. Thompson had borrowed several tools from his employer, IMI, including the nail gun. IMI was a company engaged in the business of selling real estate and building homes. Thompson worked for IMI as a construction superintendent, but had no ownership interest in the company. No employees of IMI except Thompson ever worked on the construction of Thompson's home. Thompson did not pay IMI for the use of its tools.

Ron Bailey came to the construction site to visit some friends. He was not hired to work on Thompson's personal residence, but he decided to volunteer his assistance. Immediately before the accident, K.C. was standing on a short ladder nailing a board to the garage wall. Ron Bailey was under K.C., bent-over, between the ladder and the garage wall, trying to assist K.C. by moving the board upon which K.C. was nailing because the board was crooked. K.C. did not ask Ron Bailey for help and was used to working alone. K.C. nailed the board into the garage wall. As K.C. started his descent from the ladder, Bailey stood up, hitting the bottom portion of the nail gun and causing it to discharge. A nail was discharged from the gun into the top of Bailey's head.

On February 10, 1994, Bailey filed suit against IMI for the injuries he received as a result of the nail gun accident. Bailey alleged three claims in his petition: two claims sounding in strict liability—product defect and failure to warn—and one claim for negligent furnishing of a dangerous instrumentality. On January 16, 1995, IMI filed a motion for summary judgment, which the trial court granted on March 6, 1995. Bailey appeals.

### Strict Liability

■ Bailey claims that the trial court erred in granting summary judgment in favor of IMI on Counts I and II of the petition. In reviewing a grant of summary judgment, this court reviews the record in the light most favorable to the party against whom summary judgment was entered. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Review by this court of the grant of summary judgment is essentially de novo. *Case v. Midwest Mechanical Contractors, Inc.*, 876 S.W.2d 51, 52–53 (Mo.App.1994). Facts provided by affidavit or otherwise are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376. "A defending party who moves for summary judgment may prove that it is entitled to judgment by showing that the non-movant will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the essential elements of the non-movant's case." *Case*, 876 S.W.2d at 53.

■ In Counts I and II, Bailey alleges that IMI is liable under the theory of strict liability for a product defect and for failure to warn. IMI denied liability in its summary judgment motion, claiming that IMI did not inject the nail gun into the stream of commerce and Thompson did not receive the nail gun for the mutual benefit of himself and IMI. In the motion for summary judgment, IMI sets out facts, unrebutted by Bailey, that establish that IMI did not "sell" the nail gun in the course of its business. Bailey concedes that there is no evidence that IMI sold the nail gun, but asserts that an actual sale of the nail gun by IMI is not required to satisfy this element. In *Gunderson v. Sani–Kem Corp.*, 674 S.W.2d 665, 668 (Mo.App. 1984), this court held:

The word "sells" within the Restatement rule [Rest.2d Torts, Sec. 402A] of strict liability is merely descriptive, and the test for determining the applicability of the rule is not the sale of the product, but rather the placing thereof in commerce. Thus, liability is imposed on all those in the chain of placing a defective product in the stream of commerce, and the product need not be actually sold if it has been injected in the stream of commerce by other means. Under the stream-of-commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability; it is the defendant's *participatory*

*connection, for his personal profit or other benefit,* with the injury-producing product and *with the enterprise that created consumer demand for and reliance upon the product* which calls for the imposition of strict liability. . . .

(Emphasis in original). *Gunderson* involved a strict liability action brought against a supplier of lubrication equipment for continuous conveyor systems by a person injured when his hands became caught in a chain. This court concluded that the jury could find from the evidence that the defendant was more than just a "casual supplier" of the lubrication equipment and that the design of the modification and the furnishing of the spray nozzles on the conveyor system was not an isolated incident. *Id.* The court also stated that the jury could find defendant proposed to alter the lubrication system for the purpose of gaining Fairmont's business for lubrication supplies, and to eliminate competition. *Id.*

In *Commercial Distribution Center, Inc. v. St. Regis Paper Co.,* 689 S.W.2d 664 (Mo. App.1985), the owner of an underground refrigeration facility brought suit against certain contractors for damages caused when suspended refrigeration pipelines collapsed. This court noted that a supplier is in the same position as a seller under the doctrine of strict liability in tort. *Id.* at 670. The court followed the principles handed down in *Gunderson* and held that the test is not the sale of the product, but instead is the placing the product in the stream of commerce. *Id.* The court found that plaintiff had proven defendants were in the business of selling and supplying the defective products under the *Gunderson* analysis. *Id.*

■ The record before us shows that IMI's action of supplying the nail gun to Brent Thompson for use on Thompson's home was an isolated, non-commercial transaction. There is no evidence that IMI received any sort of compensation for Thompson's use of the gun, monetary or otherwise. IMI was not in the business of selling or furnishing tools, but instead was a company engaged in the business of selling real estate and building homes. It was understood between IMI and Thompson that he had permission to use the nail gun. Bailey has cited no case law supporting his position that such

an understanding amounts to an act of placing the tool in the stream of commerce. We decline to accept such a proposition. Thus, summary judgment was appropriate as to the counts alleging strict liability. Point is denied.

### Negligence

Bailey contends that the trial court erred in granting summary judgment in favor of IMI on Count III, which charged IMI with negligently supplying a dangerous instrumentality. Bailey asserts that the trial court ignored evidence that IMI supplied the nail gun to Brent Thompson, which is sufficient, standing alone, to allow submission of Bailey's claim.

To support Bailey's negligence claim, he alleged in his petition that IMI "supplied a nail gun for use, and the nail gun did not have an adequate mechanism to prevent accidental, unintended discharge and was, therefore, dangerous when put to a reasonably expected use." He alleged that IMI had no reason to believe that "those for whose use the nail gun was applied would realize its dangerous condition." The petition alleged that IMI "knew, or had information from which [IMI] should have known of such dangerous condition," and that IMI failed to exercise ordinary care to either make the nail gun reasonably safe, or adequately warn of its dangerous condition.

■ Liability may be predicated on the theory of negligence in product liability cases. *St. Regis Paper,* 689 S.W.2d at 671. To support such a claim, there must be a duty imposed on a manufacturer, seller, or other supplier, with respect to foreseeable dangerous consequences of a product. *Id.* The breach of the duty owed constitutes negligence. *Id.* Bailey claims that IMI owed him a duty to protect him from being injured by the nail gun. He has failed to present any authority for this proposition. In his brief, he simply states that: "The tort of 'negligently supplying a dangerous instrumentality,' as set forth in M.A.I. 25.10(a) assumes a duty to the public and any possible user of the instrumentality."

■ Bailey brought his action in negligence. He must establish a duty on the part of IMI to protect him from the injury which

he suffered. Duty is a matter of law which is properly determined by the court. *Case,* 876 S.W.2d at 53. We have found no Missouri case directly on point, but the case of *Ridenhour v. Colson Caster Corp.,* 687 S.W.2d 938 (Mo.App.1985) is analogous to the case at bar. The *Ridenhour* case involved an action for wrongful death brought by the widow of a fatally injured employee of a general contractor. *Id.* at 939. The deceased was an iron-worker who was employed by McCarthy Brothers Construction Company ("McCarthy"). He died as a result of injuries he sustained when he fell from a scaffold owned by a subcontractor of McCarthy. McCarthy borrowed the scaffold for use by McCarthy's employee. The verdict director alleged that the casters, which were attached to the legs of the scaffold, had been improperly welded, were dangerous when put to a use reasonably anticipated and that the subcontractor was negligent because the subcontractor knew or "by using ordinary care could have known of such dangerous condition," yet failed to warn the deceased of the dangerous condition. *Id.* at 939. The jury found in favor of plaintiff and against the subcontractor and awarded plaintiff $150,000.00. On appeal, the subcontractor argued that (1) there was no evidence showing that the subcontractor derived any commercial benefit from the deceased's use of the scaffold; (2) the deceased's use of the scaffold was the product of a "gratuitous bailment"; and (3) the bailor in a gratuitous bailment is not liable to the bailee for injuries arising out of a defect in the bailed article unless the bailor had *actual knowledge* of the defect and failed to warn the bailee of it. *Id.*

Finding no Missouri authority on point, the court in *Ridenhour* analyzed the law of other jurisdictions, stating:

There is substantial out-state authority for the proposition that a subcontractor whose equipment is used gratuitously by an employee of another contractor or subcontractor on the same project is not, as a general rule, liable for injuries sustained by the user as a result of the defective condition of the equipment where the subcontractor lacked actual knowledge of the defective condition, because the user in such a case is a mere licensee or gratuitous bailee.

*Id.* at 941 (citations omitted). The court quoted 8 Am.Jur.2d Bailments § 162, p. 894, to show the rationale for this line of case law:

Where a bailment is purely gratuitous, and created for the exclusive benefit of the bailee, as where articles are loaned to another simply for his own use, without any reward or compensation being received from him by the lender, the bailor's only duty with respect to defects is to inform the bailee of any of which he is aware and which might make the use of the subject of the loan perilous to the bailee or his servants. The ground of this obligation is that when a person lends he ought to confer a benefit, not do a mischief. But the obligation of a mere lender goes no further than this, and he cannot therefore be made liable for not communicating anything he did not in fact know, whether he ought to have known it or not.

*Id.* The court distinguished the situation where the bailment is for the mutual benefit of both bailor and bailee, and stated that in "mutual benefit" bailments, the bailor has a duty to deliver the loaned articles in a proper condition to be used by the parties. *Id.* at 944 (quoting *Clark v. Granby Mining & Smelting Co.,* 183 S.W. 1099, 1101 (Mo.App. 1916)). If the bailor fails to provide the loaned articles in a proper condition, he is liable for any damage suffered by the bailee from the article's unsafe condition. *Id.*

The court in *Ridenhour* reversed the judgment of the trial court and held that (1) to impose liability on the subcontractor, plaintiff was required to show that the subcontractor had actual knowledge of the defect in the scaffold and failed to give proper warning; (2) the scaffold was not supplied to the employee for business purposes, and the bailment of the scaffold was gratuitous; and (3) the jury instruction was reversibly erroneous in not limiting liability of the subcontractor to actual knowledge. In reversing the trial court's decision, the court stated: "A contrary holding, making it the duty of a subcontractor at least to conduct a reasonable inspection of his equipment before permitting it to be borrowed by employees of other contractors or subcontractors, might undermine a custom of mutual lending." *Ridenhour,* 687 S.W.2d at 946.

The "mutual benefit test" guides us in our determination as to whether a "gratuitous" or "mutual benefit" bailment was created here. The issue is whether the owner of the nail gun, IMI, received benefit or advantage from the permitted use by Brent Thompson of the nail gun. *See Ridenhour*, 687 S.W.2d at 942 (quoting *Arthur v. Standard Engineering Co.*, 193 F.2d 903, 907 (D.C.Cir.1951)). Thompson did not compensate IMI monetarily or otherwise for use of the nail gun. The sole owner and president of IMI, James Glascock, stated by affidavit that IMI had received no benefit from the use of the nail gun. Bailey failed to present any evidence to contradict Glascock's assertion. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the nonmoving party's response to the summary judgment motion." *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376. In his brief, Bailey states:

> Because Robert Brent Thompson received the nail gun from IMI, as a benefit of his employment, IMI owned the nail gun, and Thompson would not have received the gun from IMI had he not been currently employed by them, Petitioner believes the connection is sufficient to show that a jury could find that IMI received a benefit from the satisfaction of its employees.

Bailey did not refute Glascock's affidavit concerning lack of benefit, but relies merely on the employment connection as establishing "mutual benefit." We do not believe the employment connection, standing alone, is sufficient. We conclude that IMI's act of loaning the nail gun to Thompson constituted a gratuitous bailment.

Since the bailment between IMI and Thompson was gratuitous, it was incumbent upon Bailey to plead and prove that IMI had actual, and not merely constructive, knowledge of the alleged defect in the nail gun to impose liability upon IMI. *See Ridenhour*, 687 S.W.2d at 944. Consequently, Bailey's reliance on M.A.I. 25.10(A) as authority for this case is misplaced. That instruction does not apply to gratuitous bailments. In support of IMI's motion for summary judgment, IMI submitted the deposition of Mr. Glascock in which he stated that he was not aware of any complaints about the nail gun or problems with the nail gun prior to the accident. Bailey failed to present any evidence refuting Mr. Glascock's testimony, and failed to show why there was any reason to believe that further discovery would produce evidence refuting his testimony. We accept as true Glascock's uncontradicted deposition testimony that he had no knowledge of a dangerous condition or defect concerning the nail gun. *See ITT Commercial Finance*, 854 S.W.2d at 376. Bailey has failed to show the existence of evidence which would prove IMI had actual knowledge of a defect, an essential element of Bailey's cause of action. Thus, the trial court correctly granted summary judgment in favor of IMI. Judgment is affirmed.

All concur.